**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LESLIE SZABLA,

       Plaintiff,

                                              Case No. 09-13042
v.                                            Hon. Lawrence P. Zatkoff

ST. JOHN HOSPITAL & MEDICAL
CENTER,

       Defendant.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on August 24, 2011.

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter comes before the Court on Defendant's motion for summary judgment [dkt 26]. The motion has been fully briefed. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L. R. 7.1(f)(2), it is hereby ORDERED that the motion be resolved on the brief submitted. For the reasons set forth below, Defendant's motion for summary judgment [dkt 26] is GRANTED.

## II. BACKGROUND

The present case involves claims brought against St. John Hospital & Medical Center ("Defendant") by former employee Leslie Szabla ("Plaintiff"), who filed a three-count Complaint: (Count I), gender discrimination based on pregnancy under Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000(e), *et seq*., as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e ("Title VII"); (Count II), violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*.;[1] and (Count III), failure to accommodate her disability (*i.e.*, her pregnancy) under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*.

As of September of 1986, Defendant employed Plaintiff in Defendant's Medical Intensive Care Unit ("MICU"). During a portion of this time, Deborah Ritter ("Ritter") supervised Plaintiff. In July of 2001, Plaintiff left Defendant and moved to Florida. Upon returning to Michigan in June of 2005, Defendant rehired Plaintiff as a Patient Care Technician ("PCT").[2] Plaintiff's work scheduled consisted of three days a week for twelve-hour shifts.

**A. DEFENDANT'S POLICIES & PROCEDURES**

Governing Plaintiff's employment were three relevant policies: (1) Unscheduled Absences (Policy Guideline No. 515.1); (2) Position Transfers (Policy Guideline No. 625); and Leaves of Absence (Policy No. 321).

In addressing unacceptable attendance and unscheduled absences, the Unscheduled Absences policy states such absences are "tracked within a rolling 12-month period." The policy delineates

---

[1] In responding to Defendant's motion for summary judgment, Plaintiff withdraws Count II. Therefore, the Court finds that Plaintiff concedes that summary judgment should be granted on Count II in favor of Defendant. Defendant is granted such and Count II is dismissed.

[2] Relevant to the instant motion, is the positions utilized in Defendant's MICU. A PCT is trained, among other duties, to draw blood, assist a Registered Nurse ("RN") with critical patients, get medical equipment, take vitals, and administer medications. In the MICU, there are typically two PCTs per shift and approximately ten RNs. Undisputedly, all PCTs worked 12-hour shifts, three days a week. A third position in the MICU is a Health Unit Coordinator ("HUC"). HUCs are responsible for entering doctors' orders into the charts, maintaining the charts, answering the phones and providing the RNs with blood-draw slips. A RN is trained to handle a PCT's duties, however, a PCT cannot do a RN's duties. PCTs are cross-trained as HUCs, but a HUC cannot do a PCT's duties.

the types of absences available and explains the corrective actions taken depending on the type of absence and the number of warnings given to an employee in the "rolling 12-month period." The corrective actions are delineated in four steps, in which step one results in a corrective action report and step four results in discharge. The Position Transfers policy states that if an employee has received a step two or step three corrective action within the twelve months prior to a job posting date, that employee is ineligible to transfer to the new position. The Leave of Absence policy provides employees with three types of approved leave: (1) FMLA, (2) Non-FMLA, and (3) Personal. FMLA and Non-FMLA leave may not exceed twelve weeks, as opposed to Personal leave, which may not exceed six months.

**B  PLAINTIFF'S CORRECTIVE ACTION**

Relevant to this case, Plaintiff received numerous corrective actions for excessive absenteeism:

3/21/06: Plaintiff received a corrective action (verbal consultation).

3/29/06: Plaintiff received a step one corrective action.

1/11/07: Plaintiff recieved a step two corrective action.

2/13/07: Plaintiff had excessive absences, but Ritter never issued a formal corrective action.

2/18/08: Plaintiff received a corrective action (verbal consultation).

3/25/08: Plaintiff received a step one corrective action.

6/24/08: Plaintiff received a step two corrective action.

The three correctives actions in 2008 were issued by other supervisors, not Ritter.

**C. PLAINTIFF'S WORK RESTRICTIONS**

Plaintiff became pregnant in 2007. On February 26, 2007, Plaintiff was placed on work restrictions of no lifting over 20 lbs. and no pushing or pulling. These restrictions were accommodated until March 26, 2007, at which time Plaintiff accepted transitional work until she was cleared of her restrictions.[3] On April 2, 2007, Plaintiff returned to her PCT position. On September 18, 2007, Plaintiff was placed on work restrictions, which Ritter accommodated. This pregnancy resulted in a miscarriage. In February of 2008, Plaintiff became pregnant again. To minimize the possibility of a second miscarriage, on July 29, 2008, Plaintiff received a note from her treating physician, recommending to Defendant that Plaintiff work 8-hour shifts, rather than her scheduled 12-hour shifts. According to Plaintiff, she called Ritter the same day requesting a reduced 8 hour shift, which Ritter denied. Ritter's testimony is unclear on the conversation that occurred during this call.

Nonetheless, on July 31, 2008, Plaintiff returned to work assuming she would be accommodated. Ritter then told Plaintiff that she had to either work the 12-hour shift or leave. Plaintiff left the MICU and went to the Occupational Health Office where she spoke with Nancy Duensing, a RN. Duensing purportedly agreed with the need for a reduced work shift and drafted a note for Plaintiff stating such. Duensing took Plaintiff to Albina Srodan. Srodan handles TWP for Defendant. Srodan told Plaintiff to take the note to Ritter. Srodan then received a call from Ritter, informing Srodan that Ritter could not make such accommodations. Subsequently, Plaintiff

---

[3] Defendant provides a program entitled, "Transitional Work Program" ("TWP"). TWP allows employees with occupational and non-occupational restrictions to transfer to a different position with Defendant that is commensurate with the employee's restrictions. TWP may not exceed 12 weeks, and it is an alternative to FMLA leave for that period.

provided a physician's note, dated August 1, 2008, to Ritter, restricting Plaintiff to work only 8-hour shifts rather than 12-hour shifts. Ritter denied accommodating the restriction. Defendant did, however, offer Plaintiff transitional work. The parties dispute the actual manner in which Plaintiff did not accept the transitional work.

### D. PLAINTIFF'S LEAVE OF ABSENCES AND TERMINATION

On August 5, 2008, Plaintiff began FMLA leave, which expired on October 24, 2008. On October 25, 2008, Plaintiff began 12 weeks of Non-FMLA leave. During this leave, Defendant is permitted to fill Plaintiff's position. On October 27, 2008, Plaintiff's PCT position was posted, and was later filled on November 30, 2008. On December 26, 2008, Defendant responded by letter to Plaintiff's e-mail, regarding her PCT position. The letter, written by Rosean Nicosia as a consultant for Defendant, indicated Plaintiff's position was no longer protected once she took Non-FMLA leave and her position had been filled. The letter also explained that due to the June 24, 2008, step two corrective action, Plaintiff was not eligible to transfer to another PCT position on another unit until after June 24, 2009—the date her step two corrective action would no longer be within the rolling 12 month period.

On November 16, 2008, Plaintiff had her child and was released to return to work without restrictions on January 5, 2009. Because she could not return to her former PCT position and transfer to another position until her step two correction fell outside the rolling 12 month period, she requested and was granted a Personal leave for six months. After June 24, 2009, her step two corrective action no longer excluded her from transferring to another position. She applied for positions with Defendant, including her former PCT position, which had become available. As of July 5, 2009, Plaintiff exhausted her FMLA, Non-FMLA, and Personal leave, and she had not obtained another position. As a result, Defendant changed her employment status to voluntary

termination.

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or;
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323. The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

### A. TITLE VII: PREGNANCY DISCRIMINATION (COUNT I)

The Pregnancy Discrimination Act provisions of Title VII make it an unlawful employment practice for an employer to discriminate "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k); *see* 42 U.S.C. § 2000e-2(a). "[W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Id.*

A plaintiff asserting a claim of pregnancy discrimination can proceed under three analytical frameworks: (1) direct evidence; (2) the mix-motive model; and (3) the burden-shifting *McDonnell Douglas* framework. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008); *McDonnell Douglas v. Green*, 411 U.S. 792, 802–03 (1973). The latter two models are based on circumstantial evidence. In this case, Plaintiff alleges that there is both direct and circumstantial evidence of pregnancy discrimination.

### *i. Direct Evidence*

Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-lough*

*Healthcare Prod. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). *See also Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (explaining that direct evidence is similar to an employer stating, "I fired you because you are disabled"). "[T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [pregnancy], but also that the employer acted on that predisposition." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000). In considering whether a comment by the employer constitutes evidence of discrimination, this Circuit has applied four factors:

> (1) Whether the disputed comments were made by the decision maker;
>
> (2) Whether the alleged comments related to the decision-making process;
>
> (3) Whether the statements were vague, ambiguous, or isolated remarks; and
>
> (4) Whether the disputed remarks were made proximate in time to the termination.

*Cooley v. Carmike Cinemas*, 25 F.3d 1325, 1330 (6th Cir. 1994).

Plaintiff argues that Ritter made two statements that constitute direct evidence of discrimination: (1) "[Plaintiff] was too 'F'-ing old for this," and (2) Plaintiff "must have some old eggs up there." Defendant responds first by contesting whether the statements even occurred. Defendant then argues, even if the statements occurred, they fail to satisfy the four factors applied by this Circuit.

The Court first notes that a genuine dispute exists as to whether the statements were made. Plaintiff has testified that such statements occurred, as opposed to Ritter, who denies making such statements. Plaintiff's purported witness of the events, Michelle McMahon, also denies that the

statements were made. At this juncture, however, the Court may not weigh the credibility of the evidence. *See Centra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008) ("It is an error for the district court to resolve credibility issues against the nonmovant"). Thus, the Court proceeds to consider whether this dispute is material, *i.e.*, are the statements direct evidence of discrimination.

With respect to the first factor, Plaintiff fails to establish that Ritter was the decision maker with respect to Plaintiff's adverse employment decisions. Ritter denied Plaintiff's 8-hour shift accommodation. Ritter, however, did not make the decision to give Plaintiff a step two corrective action or change Plaintiff's employment status to voluntary termination.

With respect to the second factor, Plaintiff fails to show that Ritter's decision to deny Plaintiff's requested accommodation was related to Ritter's purported statements. Plaintiff also fails to show that Ritter's purported statements were related to another assistant manager issuing Plaintiff a step two corrective action or Defendant's decision to change Plaintiff's employment status to voluntary termination.

With respect to the third and fourth factors, no evidence indicates that Ritter's purported statements evince a likelihood that she discriminated against Plaintiff due to her pregnancy. *See Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (stating that comments are not direct evidence of discrimination if a fact finder would be required to "draw any inferences" about the meaning); *Amini v. Oberlin College*, 440 F.3d 350, 359 ("Evidence of discrimination is not considered direct evidence unless a . . . motivation is explicitly expressed."). Thus, assuming the statements were made, a reasonable jury could not find that Ritter's statements are direct evidence of pregnancy discrimination.

**ii. Mixed-motive Framework**

Mixed-motive claims of discrimination occur "where both legitimate and illegitimate reasons motivated the employer's decision." *White*, 533 F.3d at 396. The *McDonnell Douglas* burden-shifting framework is inapplicable to such claims. *Id.* at 400. Rather, a plaintiff must show that "(1) the defendant took an adverse employment action against the plaintiff; and (2) [the plaintiff's pregnancy] was a motivating factor for the defendant's adverse employment action." *Id.; see Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010). "An adverse employment action is an action by the employer that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White*, 533 F.3d at 402 (quoting *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998)).

Plaintiff argues that Defendant was partially motivated by her pregnancy when Defendant removed her from the MICU because Plaintiff was incapable of working a 12-hour shift and when Plaintiff received the step two corrective action that played a critical role in her termination. Plaintiff asserts that both of these actions were adverse employment actions. Defendant maintains that a PCT must work 12-hour shifts to be qualified, and that Plaintiff's own actions resulted in the step two corrective action, not discrimination due to her pregnancy.

In this case, the Court finds that Plaintiff fails to show sufficient evidence that her pregnancy was a motivating factor for such a decision. Plaintiff's employment status was changed to voluntary termination because she had exhausted all of her leave and had not been transferred to a new position. Plaintiff has shown no evidence that her election to take leave is the result of an animus by Defendant to discriminate against her due to her pregnancy. As of January 5, 2009, Plaintiff was

no longer medically restricted, however, her position was filled while she was on Non-FMLA leave. Defendant's policies indicate that once an employee takes Non-FMLA leave his or her position is no longer protected. Plaintiff points to no evidence that Defendant was motivated to post and fill Plaintiff's position due to her pregnancy. Because Plaintiff's position was filled, Plaintiff had to transfer to a new position. However, due to Plaintiff's absences and Defendant's policies, her step two corrective action excluded her from transferring to a new position until after June 24, 2009, not a motivation by Defendant to discriminate against her. After June 24, 2009, when her step two corrective action no longer excluded her from transferring, Plaintiff concedes in her response brief that her application for her former PCT position was rejected because Defendant hired someone more qualified. Unable to find a new position, Plaintiff was voluntarily terminated. Plaintiff provides insufficient evidence that a reasonable jury could find that Defendant, at a minimum, was partially motivated by Plaintiff's pregnancy to not rehire Plaintiff and terminate her employment.

With respect to Ritter's denial of Plaintiff's 8-hour shift accommodation, the testimony of Ritter, Plaintiff, and DeRychere establish that no similarly situated non-pregnant PCT had been provided such an accommodation. Plaintiff relies on two accommodations (DeRychere and Caius Cardozo) made by Ritter to suggest that Plaintiff's pregnancy was at least a motivating factor in the denial of her accommodation. However, DeRychere worked as an RN, and Cardozo worked as a HUC. Plaintiff provides no evidence that such accommodations were provided to PCTs.

Furthermore, with respect to Plaintiff's step two corrective action, Plaintiff appears to argue that Ritter was motivated to discriminate against Plaintiff due to her pregnancy, and this motivation resulted in Plaintiff's step two corrective action. Ritter, however, did not issue Plaintiff's second step two corrective action, and Plaintiff provides no evidence that this corrective action was

11

motivated in part by Plaintiff's pregnancy. The mere fact that Plaintiff's pregnancy was a link in the chain of events that resulted in her absences does not show that Defendant was motivated by Plaintiff's pregnancy. *See Spees*, 617 F.3d at 394. Accordingly, a reasonable jury could not find that Defendant, even partially motivated by Plaintiff's pregnancy, discriminated against her.

### iii. McDonnell Douglas *Framework*

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first satisfy the elements of a prima facie case by showing that she was: (1) pregnant, (2) qualified for her job, (3) subjected to an adverse employment decision, and that (4) there is a nexus between her pregnancy and the adverse employment decision." *Tysinger v. Police Dept. of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000)). If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for terminating the plaintiff. *Tysinger*, 463 F.3d at 576 (citing *Cline*, 206 F.3d at 658). If the defendant satisfies this burden, the plaintiff must rebut the defendant's nondiscriminatory reason by showing that it is a mere pretext for discrimination. *Id.* Pretext is demonstrated by showing that the nondiscriminatory reason (1) is unsupported by fact, (2) did not motivate the defendant to terminate the plaintiff, or (3) was insufficient to justify the plaintiff's termination. *Id.* at 576 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Plaintiff contends that there is substantial evidence that Ritter's reason for denying Plaintiff's 8-hour shift accommodation was mere pretext. Plaintiff further contends that Ritter and DeRychere's testimony show that accommodating Plaintiff was reasonable and had been done for non-pregnant employees. Defendant argues that Plaintiff fails to establish a prima facie case

12

because: (1) she was not qualified for the PCT position, and (2) her pregnancy was unrelated to any adverse employment decisions. Defendant does not appear to contest that Plaintiff suffered an adverse employment decision. To that extent, the Court will consider first whether Plaintiff has established a prima facie case of discrimination. Therefore, the Court will analyze the second and fourth elements of Plaintiff's prima facie case.

**1. Unqualified for PCT Position**

The Court finds that Plaintiff was not qualified for the PCT position. As the physician's notes and testimony indicate, from approximately August 1, 2008, through January 5, 2009, Plaintiff was medically restricted from working a 12-hour shift—a requirement of the PCT position. *See Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered 'qualified'"). Even though Plaintiff argues this was not a requirement of the PCT position as supported by DeRychere's testimony, the fact that Ritter accommodated DeRychere (recovering from hip surgery) and Cardozo (recovering from a car accident) with 8-hour shifts is distinguishable. Neither DeRychere nor Cardozo were in similarly situated positions (*i.e.*, working as PCTs). DeRychere worked as an RN in the MICU, and Cardozo worked as an HUC in the MICU. Furthermore, Ritter's testimony indicates that a 12-hour shift is an essential function of the PCT position, thus the reason Ritter denied Plaintiff's request for an 8-hour shift accommodation. And, DeRychere, although accommodated a shift-reduction as a RN, testified that she was unaware of any PCT that has not worked 12-hour shifts.

Moreover, Plaintiff was no longer medically restricted as of January 5, 2009. Although she would have been able to work 12-hour shifts, her PCT position had been filled while Plaintiff was

on Non-FMLA leave. And according to Defendant's policies, Plaintiff's step two corrective action limited her ability to transfer to a new position until after June 24, 2009. Thus, Plaintiff remained unqualified for a PCT position.

## 2. No Nexus Between Pregnancy and Adverse Employment Decision

The Court also finds that Plaintiff fails to establish a nexus between her pregnancy and the denial of her 8-hour shift accommodation, her step two corrective action, and her employment status change to voluntary termination.

With respect to her 8-hour shift accommodation, as set forth above, Plaintiff has shown no evidence that the denial of her accommodation was even partially motivated by her pregnancy. The evidence indicates that an essential requirement of the PCT position was to work 12-hour shifts. Plaintiff was denied the accommodation because she was medically restricted to 8-hour shifts. The evidence even indicates that Plaintiff was provided transitional work which would accommodate her medical restrictions. There was no decrease in pay if Plaintiff accepted the position. Plaintiff, however, denied the transitional work and went on FMLA leave.

With respect to her step two corrective action, Plaintiff's employment history shows that she had received corrective actions for absences almost two years prior to her second pregnancy. In 2006 and 2007, Plaintiff received three corrective actions, including a step two corrective action on January 11, 2007. The same pattern of absences continues in 2008, at which time Plaintiff received another step two corrective action on June 24, 2008. Plaintiff now argues that her pregnancy was a motivating factor in receiving it. However, Plaintiff provides no reasons for why her prior absences and corrective actions in 2006 and 2007 are any different from the corrective actions she received in 2008. Furthermore, her argument that Ritter used the corrective actions to force her out

14

of the MICU due to Plaintiff's pregnancy is unavailing. Even though Ritter issued the corrective actions in 2006 and 2007, the corrective actions in 2008 that contributed to Plaintiff's inability to transfer to a new position were issued by assistant managers other than Ritter. Specifically, the June 24, 2008, corrective action was issued by Assistant Clinical Manager Bernice Amos-Jones. Plaintiff provides no evidence that the other assistant managers were motivated by Plaintiff's pregnancy to discriminate against her.

With respect to Plaintiff's employment status, she was not qualified as a PCT until June 24, 2009. On July 5, 2009, she exhausted all leave—FMLA, Non-FMLA, and Personal. During this time period, Plaintiff produces no evidence that Defendant or its employees were even partially motivated by her pregnancy to not transfer her to a new position.

As such, Plaintiff fails to establish a nexus between her pregnancy and any adverse employment decision. Plaintiff also fails to show that a genuine dispute exists that she was qualified for the PCT position and that there is a nexus between her pregnancy and any adverse employment decisions. In sum, Plaintiff has failed to prove a prima facie case of discrimination.[4] Therefore, Plaintiff's claims fail under the *McDonnell Douglas* framework.

**IV.** *Conclusion*

For the reasons set forth above, no reasonable jury could find that Defendant discriminated against Plaintiff due to her pregnancy under Title VII. As such, Defendant is granted summary judgment with respect to Plaintiff's Title VII claim (Count I).

---

[4] Defendant also argues that it had legitimate nondiscriminatory reasons for terminating Plaintiff and such reasons were not a pretext to discriminate against Plaintiff. The Court need not address these arguments having determined that Plaintiff failed to establish a prima facie case of discrimination.

**B.     AMERICANS WITH DISABILITIES ACT (COUNT III)**

Defendant moves for summary judgment on Plaintiff's Count III because (1) Plaintiff's pregnancy is not a disability within the meaning of the ADA, (2) Plaintiff was not qualified to perform the essential functions of a PCT, and (3) Plaintiff was offered transitional work as an accommodation to her request.  In Plaintiff's response brief, she argues that she was unlawfully denied an 8-hour shift accommodation under the ADA due to her pregnancy because Defendant failed to show that the accommodation would have imposed an undue hardship on it.

The ADA mandates that "no covered entity shall discriminate against a qualified individual on the basis of disability. . . ." 42 U.S.C. § 12112(a).  Such discrimination includes "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the . . . entity." *Id.* at § 12112(a)(5)(B).

A plaintiff asserting a discrimination claim or reasonable accommodation claim must establish that he or she is disabled with in the meaning of the ADA. *Burns v. Coca-Cola Enterprises, Inc.*, 222 F.3d 247, 253 (6th Cir. 2000).  In 2008, Congress enacted the ADA Amendments Act of 2008, P.L. 110-325, and changed the definition of "disabled" within the meaning of the ADA. *Milholland v. Sumner Cnty. Bd. Of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009). Acts occurring before January 1, 2009, are analyzed under the pre-amendment version of the ADA. *Id.*  Because Defendant denied Plaintiff's accommodation in August of 2008, the pre-amendment version of the ADA applies.

A disability is defined within the ADA as "a physical or mental *impairment* that *substantially* limits one or more of the *major life activities* of such individual." 42 U.S.C. § 12102(2)(A)

16

(emphasis added). Having only an "impairment" is not sufficient under the pre-amendment version of the ADA. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002). An "impairment" that "substantially limits" means that the plaintiff is "unable to perform a major life activity the average person in the general population can perform." *Id.* at 195. A non-exhaustive list of "major life activities" includes walking, seeing, hearing, and performing manual tasks. *Id.* The Act requires a case-by-case application of the terms to determine the existence of a disability. *Id.* at 198; 42 U.S.C. § 12102(2). Specifically relevant to this case, pregnancy alone does not qualify as a disability under the ADA. *Spees*, 617 F.3d at 396; *see Navarro v. Pfizer Corp.*, 261 F.3d 90, 97 (1st Cir. 2001). Pregnancy-related conditions, including the risk of a miscarriage, however, can qualify as a disability. *Spees*, 617 F.3d at 396–97.

Plaintiff argues that her pregnancy is a serious physical impairment. She points to her prior miscarriage; bleeding and lower abdomen groin pain that developed during her second successful pregnancy; her June 2008 medical restrictions to not lift more than 25 lbs and not strenuously push or pull; and her July 2008 medical restriction to an 8-hour shift work day. Defendant refutes Plaintiff's argument in that pregnancy by itself is not a serious physical impairment and Plaintiff's 8-hour shift medical restriction still allowed her to work a normal work week.

The Court finds that Plaintiff has not shown that her pregnancy, and its complications, were a substantially limiting impairment within the meaning of the ADA. *See Williams*, 534 U.S. at 195. First, Plaintiff produces insufficient evidence to demonstrate that her bleeding and lower abdomen groin pain considerably restricted activities that were of central importance to her daily life. Second, Plaintiff's June 2008 medical restrictions do not indicate that she was incapable of major life activities such as caring for herself, walking, seeing, or even working. *See Daugherty v. Sajar*

*Plastics, Inc.*, 544 F.3d 696, 704 (6th Cir. 2008) (explaining that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working"). Third, Plaintiff's July 2008 medical restriction suggests that Plaintiff was capable of major life activities. Her physician, after evaluating Plaintiff, still found that Plaintiff was capable of working a typical 8-hour day. The medical restriction placed no limits on the number of days a week Plaintiff was capable of such work, suggesting that Plaintiff could work a normal 40 hour week. *See Doren v. Battle Creek Health Sys.*, No. 4:97-CV-27, 1998 WL 689956, at 4 (W.D. Mich. June 5, 1998) (unpublished) (stating "anyone who can work 40 hours a week as a limitation of their abilities is not suffering a substantial impairment of a major life activity, namely, the ability to work"). The Court acknowledges that Plaintiff may suffer from an impairment, but no reasonable jury could conclude that her impairment substantially limited one or more of her major life activities. Therefore, Plaintiff is unable to meet the threshold requirement that she has a disability within the meaning of the ADA, and her claims under the ADA must fail as a matter of law. Defendant is granted summary judgment on Plaintiff's Count III.

## V. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [dkt 26] is GRANTED.

IT IS FURTHER ORDERED that because this resolves all claims, this case is now closed.

IT IS SO ORDERED.

          S/Lawrence P. Zatkoff
          LAWRENCE P. ZATKOFF
          UNITED STATES DISTRICT JUDGE

Dated: August 24, 2011

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on August 24, 2011.

          S/Marie E. Verlinde
          Case Manager
          (810) 984-3290